IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STEPHEN LIEBB,

    Petitioner,

  v.

J. BROWN, Warden, et al.,

    Respondents.
_____/

No. C 04-4213 CW (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Stephen Liebb, proceeding pro se, filed the present petition for a writ of habeas corpus pursuant to title 28 U.S.C. § 2254, challenging as a violation of his constitutional rights a denial of parole by the California Board of Parole Hearings (Board).[1]

Respondents have filed an answer. Petitioner has filed a traverse. Respondent has also filed a supplemental answer, and Petitioner has filed a supplemental traverse. Having considered all of the papers filed by the parties, the Court DENIES the petition.

BACKGROUND

A Los Angeles County jury found Petitioner guilty of first degree murder with the use of a deadly weapon (a knife) in violation of California Penal Code §§ 187 and 12022(b) (Count 1). (Resp't Ex. A, Abstract of Judgment.) The jury also found Petitioner guilty of assault with a deadly weapon in violation of California Penal Code § 245 (Count 2). (Id.) The Los Angeles

---

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings. Cal. Penal Code § 5075(a).

County Superior Court sentenced Petitioner to twenty-five years to life in prison for murder, plus a one year enhancement for the use of a knife, and a concurrent sentence of three years in prison for assault. (Resp't Ex. G at 1.) Petitioner was received by the California Department of Corrections and Rehabilitation on February 15, 1983, and his minimum eligible parole date was January 14, 1997. (Id.)

On July 17, 2003, twenty years into his sentence, Petitioner was found unsuitable for parole for the third time.[2] (Pet. Attach. at 37.) On September 17, 2003, Petitioner administratively appealed the Board's 2003 parole suitability decision. (Resp't Ex. F at 1.) On October 15, 2003, Petitioner's appeal was denied. (Id.)

At Petitioner's 2003 parole suitability hearing, the Board considered the following information about the murder and assault, taken from the Los Angeles County Probation Officer's Report, which in turn was derived from the District Attorney's files, police report, and transcripts:

> Diller, who is the victim, and Liebb had been friends for several years. However, there had been a disagreement between Liebb and Diller's family over rent payments. Ill feelings regarding this disagreement continued over a period of several months that included threats and physical altercations on two separate occasions. On the date of the homicide, Liebb drove his motorcycle to the victim's girlfriend's house. There he found the victim and his girlfriend sitting in the victim's car. Liebb jumped in the victim's car from the passenger side, climbed across the girlfriend and began striking the victim. In an attempt to evade the attack, the victim started to drive, but Liebb grabbed the steering wheel

---

[2] The Board found Petitioner unsuitable for parole in 1996 and 2000. (Answer at 2.)

2

> causing the car to veer to the right and crash. The victim then got out of the car and ran into the park. Liebb, in foot pursuit, chased him into the park. The victim . . . dove through a window of a recreation equipment room located on park grounds. Liebb, still in pursuit, then leaned through the broken window and stabbed the victim once in the chest. According to a witness, Liebb then returned to his motorcycle and drove away. The witness then reportedly walked to the park where she observed the victim lying on the ground covered in blood. The victim was pronounced dead at the scene. An autopsy was performed on . . . July 13th of 1981, and the cause of death recorded as due to a knife wound to the chest.

(Resp't Ex. C, Subsequent Parole Suitability Hearing Transcript at 11-12.)

Petitioner's disciplinary history while incarcerated consists of two rules violation reports (CDC-115) and one disciplinary memo (CDC-128A). (Id. at 36.) The most recent CDC-115 was issued on July 7, 1990 for refusing to work. (Id.) The remaining CDC-115 was issued on March 26, 1989 for fighting with another inmate. (Id.) His CDC-128A was issued on June 22, 1991 for refusing to work. (Id.)

Prior to his incarceration, Petitioner earned a B.A. in Marketing in 1976 from Syracuse University, and a J.D. in 1980 from UCLA Law School. (Resp't Ex. D, Probation Officer's Report at 2.) The Board reviewed Petitioner's personal background, noting that his parents supported him throughout law school. (Resp't Ex. C at 23.) As a student, he held temporary jobs such as elevator operator and lunch deliverer. (Id.)

During his incarceration, Petitioner did not participate in vocational programs offered at San Quentin State Prison (SQSP). (Id. at 28.) He testified that he believed that he would not benefit from participating in vocational programs, stating:

3

> There were other panels that specifically told me that they didn't need any vocation only avocational. And there is no vocation here. I am almost 50 years old, and I don't think I'm going to be a good welder. I feel that the job skills I have and upgrading my college education language skills [sic] that's going to enhance my ability to be employed.

(Id.)

The Board expressed its concern about Petitioner's lack of participation in "self-help and therapy, anger management or alternatives to violence" programs. (Id. at 115.) There is little or no documentation in Petitioner's central file relating to his participation in self-help groups. (Id. at 28-30.) Since his incarceration in 1983, Petitioner participated in one-on-one therapy in 1985 and in the Fathers Program in 2002. (Resp't Ex. E at 7.) Petitioner testified that he also participated in Insight Meditation. (Resp't Ex. C at 29.) He claimed that he chose to read self-help books because the self-help groups at SQSP were not "tailored to help [him] with the problem that [he has]." (Id. at 33). In response, the Board expressed its disappointment with Petitioner's explanation for his lack of participation by stating:

> [Y]eah, you are different than a lot of inmates, but I've addressed other inmates in here, doctors, I don't know if I've had another lawyer. But, very, very professional people who did one act that got them in prison. So there are peers here in prison. And they have attended programs and things. For you to say that you don't want to be in a program that isn't with your peers, you know, the whole idea of attending these classes is to interact with other people, to maybe understand the motivation and the underlying reason as to why they committed their crimes. I find that your argument for not attending self-help [is] very weak and I find your argument in saying that you already have a law degree. I know that you're doing a lot of legal work here. And, you know, perhaps you should use your marketing degree when you get out, but to go along with what the Board has recommended of you in the past specifically with self-help. I think you need to be -- pay very close attention. I think when you get a transcript of this hearing, that

>     you need to read everything and really see what the
>     concerns are and try to address them. I don't see
>     anything at all that gives me any comfort that you have
>     taken enough of the self-help classes to be assured that
>     you know how to control your anger.

(Id. at 117-18.)

The Board considered letters from friends and family from Los Angeles, New York, and Israel pledging to support Petitioner if the Board granted him parole. (Id. at 41-52.) Petitioner testified he had three separate contingency plans to accommodate parole. (Id. at 41.) Petitioner's mother and sister stated that if he were paroled to New York, they would give him a place to live and support him financially. (Id. at 41, 43.) Petitioner's friends Pat MacDannald and Bernie Dizon pledged to support him if he were paroled to Los Angeles. (Id. at 51.) Finally, Petitioner expressed his desire to be paroled to Israel, where he was in contact with people who could provide him with free room and board. (Id. at 47.)

The Los Angeles County District Attorney's Office opposed granting Petitioner parole. (Id. at 89-98.) The Deputy District Attorney suggested parole should be denied because Petitioner had "somewhat of a Jekyll and Hyde personality." (Id. at 90.) He argued that Petitioner has not addressed the issue of self-help, stating:

>     in 1985, he started involvement with some self-help, some
>     therapy, [and] some psychotherapy. He was involved in
>     programming for a number of years. Yet despite that
>     limited period of programing, in 1989, he was involved in
>     violence in prison. Subsequent to that, he's been
>     involved in supposedly reading books . . . . Anger
>     control, anger management, outbursts, and conduct are the
>     significant concern here. They were the concern at the
>     time he was out in the free community. That's what led
>     to his ultimately killing Michael Diller. The vocational
>     skills Mr. [Liebb] says, well, if you've got legal

>    skills, you don't need vocational skills.  It's not his
>    decision.  It's the recommendation of the Board.  It's
>    the same recommendation for self-help and therapy he
>    rejects doing . . . .

(Id. at 94-95.)  The Deputy District Attorney also addressed the cruelty of Petitioner's commitment offense by stating:

>    . . . an autopsy was forwarded to the inmate's Central
>    File -- that the knife blade after it was plunged into
>    [the victim], it was twisted.  That is pure and simply an
>    act of torture.  That is an act of great aggression and
>    gratuitous violence.  It is a particularly vicious . . . .
>    I think it shows a particular viciousness and spontaneity
>    and violence that has to be viewed in light of other
>    factors . . . .

(Id. at 92.)

Diller's next-of-kin also appeared at the hearing, and his brother pleaded with the Board to deny Petitioner parole.  (Id. at 105-110.)

The Board reviewed a psychological report dated February 9, 1992 by Dr. Marjorie Tavoularis.  (Id. at 76.)  The Board noted that Petitioner refused to share information about his family background in order to assist Dr. Tavoularis in formulating a prognosis.  (Id.)  In response, Petitioner claimed that he withheld this information because he felt Dr. Tavoularis had a religious bias against him.  (Id. at 78.)

The Board also reviewed Petitioner's most recent psychological report dated August 3, 1999 by Dr. L. Carr, which indicated that his potential for violence within a controlled institutional setting was "far below average when compared to the San Quentin population of inmates."  (Id. at 40.)  However, the Board found this psychological report to be inaccurate with regard to Petitioner's self-help because he had not finished the necessary programing "which is essential to his adjustment . . . ."  (Id. at

6

115.)

The Board considered the counselor's notes in the current Board report, which expressed some concern as to whether Petitioner adequately addressed the anger issues that led to the commitment offense. (Id. at 115.) Although the Board recognized that the counselor said Petitioner posed a low degree of threat, it felt that the lack of documents on Petitioner's self-help and therapy warranted more observation and evaluation before granting parole. (Id. at 115-16.)

After a brief deliberation, the Board concluded that Petitioner was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." (Id. at 111.) The Board issued a three-year denial of parole. (Id. at 118.) In support of its decision, it cited the "especially cruel manner" in which the commitment offense was carried out and how it showed "a total disregard for inflicting pain or human suffering . . . ." (Id. at 111.) It cited how he threatened "to kill the entire family" of the victim, "including himself . . ." and how he "assaulted two victims with a baseball bat, which was count two . . . " (Id. at 114, 115). The Board also based its decision on Petitioner's unstable social history, and "escalating pattern of violence and . . . history of unstable and tumultuous relationships with others." (Id. at 112.) The Board cited a report showing that Petitioner "assaulted a library monitor . . . by putting a knee to the [library monitor's] groin . . . " while at UCLA Law School. (Id. at 114.)

The Board commended Petitioner for his academic accolades prior to his incarceration and his exceptional work reports while

7

in prison. (<u>Id.</u> at 113.) The Board also recognized that Petitioner took a educational course in Spanish and worked as a food services clerk in prison. (<u>Id.</u>) However, the Board found that the positive aspects of his behavior did not outweigh the unsuitability factors. (<u>Id.</u>) The Board recommended that Petitioner "remain disciplinary free, and . . . upgrade vocationally and educationally. And, if available, participate in self-help and cooperate with clinicians in the completion of a clinical evaluation." (<u>Id.</u> at 116.)

On December 29, 2003, Petitioner filed a state habeas petition in the Los Angeles County Superior Court challenging the Board's decision. (Resp't Ex. G at 1.) On April 27, 2004, the superior court denied the petition holding that "the record contains 'some evidence' to support the Board's finding that Petitioner is unsuitable for parole," based on: the "inexplicable or trivial" motive behind the commitment offense which showed "a total disregard for inflicting pain or human suffering;" his history of unstable or tumultuous relationships; and his failure to upgrade vocationally as well as sufficiently participate in self-help programs. (<u>Id.</u> at 2-3.)

On May 20, 2004, Petitioner filed a state habeas petition in the California Court of Appeal. (Resp't Ex. H.) On June 29, 2004, the petition was denied. (<u>Id.</u>)

On July 12, 2004, Petitioner filed a state habeas petition in the California Supreme Court, which was denied on September 22, 2004. (<u>Id.</u>)

On October 5, 2004, Petitioner filed the present petition. On January 18, 2005, he filed an unopposed motion for an evidentiary

8

hearing and discovery. There, Petitioner argued that his parole was denied because the Board has a predisposition to catagorize all life-term crimes as "especially cruel, callous or egregious and hence 'exceptional'" in an effort to deny parole. In an August 24, 2005 Order, the Court denied Petitioner's motion for an evidentiary hearing, but granted in part his motion for discovery.[3]

On July 11, 2006, Petitioner filed a motion for additional discovery. On February 15, 2007, he also filed a motion to expand the record. On May 30, 2007, the Court referred Petitioner's discovery motion to Magistrate Judge James Larson. On September 25, 2007, Petitioner's motions for expansion of the record and for additional discovery were granted based on Rule 7 and Rule 6(a) of the Rules Governing § 2254 Cases, respectively. On October 1, 2007, after conducting discovery, Petitioner requested that the Court take judicial notice of all of the Board decisions he had gathered. On November 6, 2007, the Court granted Petitioner's request.

## LEGAL STANDARD

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir.

---

[3] Petitioner sought discovery of all parole decisions pertaining to life-term prisoners between the years 2000 and 2003. (Aug. 24, 2005 Order at 3.) The Court, however, limited discovery to the "year prior to Petitioner's most recent denial . . . ." (Id. at 4.) The Court reasoned that "[i]f it could be shown that all, or a significant majority of, such prisoners were denied parole . . . based on the exceptional nature of their commitment offense, then Petitioner might be able to argue that he is entitled to further discovery . . . ." (Id.)

9

2002).

Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000).  A federal court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1).

Respondents concede that Petitioner has exhausted his state remedies by filing the petition for a writ of habeas corpus in the California Supreme Court.  (Answer at 12.)  Where, as here, the highest state court to reach the merits issued a summary opinion which does not explain the rationale of its decision, federal court review under § 2254(d) is of the last state court opinion to reach the merits.  Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000).  In this case, the last state court opinion to address the merits of Petitioner's claim is the opinion of the Los Angeles County Superior Court.

DISCUSSION

I.  Jurisdiction

Respondents argue that the Court does not have subject matter jurisdiction on the grounds that denial of state parole does not affect a liberty interest protected by the United States Constitution.  (Answer at 16.)  However, the Ninth Circuit has rejected the contention that California prisoners have no liberty

10

interest in parole and thus have no federal due process rights in connection with parole eligibility. Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006). Therefore, the Court has subject matter jurisdiction under 28 U.S.C. § 2254 to decide whether Petitioner's Fourteenth Amendment right to due process was violated by the Board's determination that he was not suitable for parole.

II.  Due Process Claim

    A.  Some Evidence

Petitioner asserts that his due process rights were violated by the Board because "[t]here is no evidence to support" its decision. (Pet. Attach. at 46.)  Petitioner's claim fails.

Because California prisoners have a constitutionally protected liberty interest in release on parole, they cannot be denied a parole date without the procedural protections necessary to satisfy due process. McQuillion, 306 F.3d at 902. A parole board's decision must be supported by "some evidence" to satisfy the requirements of due process. Superintendent v. Hill, 472 U.S. 445, 455 (1985); McQuillion, 306 F.3d at 904; Morales v. California Dep't of Corrections, 16 F.3d 1001, 1005 (9th Cir. 1994), rev'd on other grounds, 514 U.S. 499 (1995). The evidence underlying the board's decision must have some indicia of reliability. McQuillion, 306 F.3d at 904; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). The factors used to determine reliability are whether the prisoner had an opportunity to appear before and present evidence to the Board, see Pedro v. Oregon Parole Bd., 825 F.2d 1396, 1399 (9th Cir. 1987), whether the prisoner's allegations of a violation by the

11

Board are of a minor nature, see Morales v. California Dep't of Corrections, 16 F.3d 1001, 1005 (9th Cir. 2002), whether the allegations are supported in fact, id., whether the prisoner had any opportunity to participate in the proceedings, id., and, whether the prisoner took full advantage of this opportunity, id.

In denying Petitioner's request for parole, the Board cited as evidence the especially cruel nature of the commitment offense by stating that:

> The offense was carried out . . . in an especially cruel manner.  Multiple victims were attacked.  One was injured in the 245 incident -- or two of them were injured in the 245 incident, which is count two, and one was killed in separate incidents. . . .  [T]he motive for the crime was unexplainable . . . in that this crime was unprovoked by the victim . . . .  [T]he prisoner waited for the victim at his girlfriend's house and when the victim arrived and the girlfriend was getting into the car, the prisoner jumped into the car and as the victim was starting to drive off, grabbed the steering wheel . . . the victim got out of the car and ran with the prisoner pursuing him.  The prisoner ultimately stabbed the victim in the chest killing him.

(Resp't Ex. C at 111.)

In addition to Petitioner's psychological assessments and disciplinary history, the Board also cited his escalating pattern of violence by explaining that he was out of control and assaulted two or three other parties three months prior to the commitment offense.  (Id. at 112, 114-16.)  Furthermore, the Board noted Petitioner's failure to complete any vocational programs, his need for more self-help or therapy programs, his need to remain disciplinary free, and his unstable social history.  (Id. at 112, 116-117.)  Even though the Board recognized certain positive aspects of Petitioner's profile, including his "exceptional work reports" and his participation in three therapy programs, it did

12

not find that those positive aspects outweighed his unsuitability factors. (Id. at 113.) Finally, the Board cited the opposition of the Los Angeles County District Attorney. (Id. at 117.)

Petitioner argues that the Board's finding that the nature of his offense outweighed the positive aspects of his profile was not supported by the evidence. He also claims that the Board's decision to deny parole violated his due process rights because it did not act impartially and did not comply with California Penal Code § 3041(a), which states that the Board "shall normally set a parole release date. . . ." Cal. Penal Code § 3041(a). There is an exception to § 3041(a), which states:

> the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense . . . or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . .

Cal. Penal Code § 3041(b). However, Petitioner argues that the Board's overuse of this exception is evidence that the Board was not impartial and had a predisposition to deny his parole regardless of the circumstances.

In Biggs v. Terhune, the Ninth Circuit found that parole denial based solely on the gravity of the commitment offense can initially satisfy due process requirements, and that the "some evidence" standard could be satisfied by the Board's consideration of the gravity of the offense. 334 F.3d 910, 915-16 (9th Cir. 2003). However, in dicta, the Biggs court held that courts may also consider the Board's decision-making process over time: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered . . . . A

13

1  continued reliance in the future on an unchanging factor . . .
2  runs contrary to the rehabilitative goals espoused by the prison
3  system and could result in a due process violation." Id. at 916-
4  17.
5       Petitioner has supplemented the record with additional
6  evidence (docket nos. 41, 48), including prior denials by the
7  Board in other inmates' parole suitability hearings, to show a
8  pattern of conduct that suggests the Board has a predisposition to
9  deny parole.  It may be logical to deduce that the current parole
10 denial rates evidence the Board's alleged predisposition to deny
11 parole.  However, Petitioner has not proven that this alleged
12 predisposition played any role in the Board's decision in his
13 case.
14      In Irons v. Carey, the petitioner was convicted of second
15 degree murder and denied parole five times.  505 F.3d 846, 849-50
16 (9th Cir. 2007).  The trial court granted the petitioner's habeas
17 petition, which challenged his parole denial after serving sixteen
18 years of a seventeen-years-to-life sentence.  Id. at 849.
19 However, the Ninth Circuit reversed, finding that the denial of
20 parole based on the egregiousness of the offense prior to the
21 expiration of the petitioner's minimum sentence was not a
22 violation of due process.  Id. at 854.  Similarly, Petitioner has
23 only been denied parole three times and has not served his minimum
24 sentence.
25      In a recent case, the Board granted the petitioner parole at
26 his eleventh parole suitability hearing after he had served
27 twenty-seven years of a fifteen-years-to-life sentence for second
28 degree murder.  See Hayward v. Marshall, 512 F.3d 536, 547 (9th

14

Cir. 2008). The Ninth Circuit found a due process violation because the governor reversed the Board's parole grant by relying on the gravity of the commitment offense, which is an "unchanging factor." Id. The Ninth Circuit also found that the governor's reversal was not supported by any evidence that the petitioner's release would threaten public safety. Id.

Here, the Board relied on more than Petitioner's commitment offense and criminal history when denying his parole. Although the "cruel and callous" nature of Petitioner's commitment offense and his criminal history weighed heavily in the Board's determination, his unstable social history, prison disciplinary history, and failure adequately to participate in vocational and self-help programs all counseled against parole. (Resp't Ex. C at 111-18.) Finally, despite not having served his minimum sentence, Petitioner is challenging only his third parole hearing while the petitioner in Hayward was challenging his eleventh.

The Los Angeles County Superior Court concluded that the record contained "some evidence" to support the Board's finding that Petitioner is unsuitable for parole. (Resp't Ex. G at 3.) The California state courts' denial of Petitioner's claim was not contrary to, or an unreasonable application of, controlling federal law, nor based on an unreasonable determination of facts. See 28 U.S.C. § 2254(d). Accordingly, Petitioner is not entitled to relief, and his due process claim is DENIED.

The Ninth Circuit's evolving guidance in Biggs, Sass, Irons, and Hayward suggests that the Board may continue to evaluate static factors, including the nature of the commitment offense and pre-conviction criminality, in deciding whether to grant parole.

15

1  See Sass, 461 F.3d at 1129.  The weight to be attributed to those
2  immutable events, however, should decrease as a predictor of
3  future dangerousness as the years pass and the prisoner
4  demonstrates favorable behavior.  See Biggs, 334 F.3d at 916-17;
5  Irons, 505 F.3d at 851.  Should Petitioner follow the Board's
6  advice by attending self-help programming and maintaining a
7  positive disciplinary record, continued parole denials based on
8  Petitioner's commitment offense alone could eventually give rise
9  to a due process violation.  See Biggs, 334 F.3d at 916-17;
10 Hayward, 512 F.3d at 547.

    B.   Sentencing Matrix

    Petitioner claims a due process violation because he is
overdue for release pursuant to the Board's sentencing matrix.
(Pet. Attach. at 9, 11.)  The base term for the first degree
murder of a "friend" resulting from "severe trauma" is twenty-
eight, twenty-nine and thirty years.  Cal. Code Regs., tit. 15,
§ 2403(b)(C)(II).  Relying on California Penal Code § 2931(a) and
California Code of Regulations § 2403(b)(C)(II), Petitioner argues
that, because he had served twenty-two years in prison when he
filed the present petition and received seven years of post-
conviction credit, he has met the maximum sentence proscribed by
the sentencing matrix.  (Pet. Attach. at 9, 11.)

    California Penal Code § 2931(a) states, "In any felony in
which a prisoner was sentenced . . . pursuant to Section
1170 . . . the Department of Corrections shall have the authority
to reduce the term prescribed . . . by one-third for good
behavior . . . ."  Cal. Penal Code § 2931(a).  If § 2931(a) was
applicable, the maximum sentence in the matrix, thirty years,

16

could be reduced by one-third or to twenty-nine years. Id. Therefore, Petitioner argues, based on his calculation, that he has served the maximum term proscribed by the sentencing matrix. (Pet. Attach. at 11.)

This argument fails. Petitioner is serving an indeterminate sentence under California Penal Code § 1168. When a prisoner is sentenced under § 1168, the parole board is empowered to determine if he is suitable for parole. Cal. Penal Code § 3040(b). If so, the board will set a release date, reducible by one-third with post-conviction credits, after consulting the matrix.[4] Cal. Code Regs. § 2411(a). However, the matrix need not be consulted if a board finds the prisoner to be unsuitable for parole. In re Dannenberg, 34 Cal. 4th 1061, 1071 (2005).

Here, the Board found Petitioner to be unsuitable for parole. Therefore, it was not required to consult the matrix or calculate good time credits. Petitioner's argument fails, and his due process claim relating to the Board's sentencing matrix is DENIED.

CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk of the Court shall enter judgment and close the file. Each party shall bear his own costs.

IT IS SO ORDERED.

Dated: 5/12/08

CLAUDIA WILKEN
United States District Judge

---

[4] "The Board may grant . . . postconviction credit when the prisoner's performance, participation or behavior warrants such adjustment . . . of credit." Cal. Code Regs., tit. 15, § 2410(b). "[T]he panel shall consider . . . (1) Performance in Institutional Work . . . , (2) Participation in Self-Help and Rehabilitative Programs . . . , [and] (3) Behavior in the Institutional Setting." Id. at § 2410(c)(1)-(3).

|   |   |
|---|---|
| UNITED STATES DISTRICT COURT | |
| FOR THE | |
| NORTHERN DISTRICT OF CALIFORNIA | |

LIEBB,

        Plaintiff,

  v.

BROWN et al,

        Defendant.

Case Number: CV04-04213 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on May 12, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Denise Alayne Yates
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Stephen Liebb C-60825
San Quentin State Prison
San Quentin, CA 94974

Dated: May 12, 2008

                                        Richard W. Wieking, Clerk
                                        By: Sheilah Cahill, Deputy Clerk